# EXHIBIT 1

FILED
9/5/2025 3:48 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2025L011179
Calendar, Y
34328146

IN THE CIRCUIT COURT OF COOK COUNTY
LAW DIVISION

Andres Guzman

    Plaintiff,

       v.

Apple Inc.

    Defendant.

Case No.: **2025L011179**

Jury Trial Demanded

For updated information about your case, including hearings, subsequent filings
and other case information, please visit our Online Case Search
and search for your case: https://casesearch.cookcountyclerkofcourt.org

## COMPLAINT AND JURY DEMAND

Plaintiff Andres Guzman ("Plaintiff" or "Mr. Guzman"), by and through undersigned counsel, brings this Complaint against Defendant Apple Inc. ("Defendant" or "Apple") under the Illinois Human Rights Act and the Illinois Whistleblower Act. In support of his claim, Mr. Guzman states as follows:

### PARTIES

1. Plaintiff Andres Guzman is an individual who resides in Chicago, Illinois.

2. Defendant Apple Inc. is a California corporation registered and authorized to do business in Illinois, operating multiple retail stores in Chicago, including the Lincoln Park store at 801 W. North Avenue where Mr. Guzman was employed.

### JURISDICTION AND VENUE

3. On January 1, 2024, Andres Guzman filed a Charge of Discrimination with the Illinois Department of Human Rights (IDHR), and the Charge was perfected on July 30, 2024, alleging discriminatory and unlawful conduct during his employment with Apple. In parallel, Mr. Guzman filed a Charge of Discrimination with the Equal Employment

Opportunity Commission (EEOC) on February 28, 2024, and later amended it on July 8, 2024, alleging discriminatory and unlawful conduct during his employment with Apple. On March 10, 2025, the Illinois Department of Human Rights conducted a Fact-Finding Conference (FFC), at which testimony and evidence were adduced concerning the discriminatory and unlawful treatment Mr. Guzman was subjected to during his employment. Following the proceedings, the IDHR issued a Dismissal Notice on June 10, 2025.

4.   This Court has personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209(a)(1) and (a)(2) because Defendant transacts business in Illinois, including operating the Lincoln Park store where Mr. Guzman worked and where the discriminatory and retaliatory acts were committed.

5.   Venue is proper in Cook County pursuant to 735 ILCS 5/2-101(2) because the events giving rise to this action occurred in Cook County, Illinois, and Defendant conducts business here.

<u>FACTS</u>

6.   In or around November 2019, Mr. Guzman began working for Defendant as a Seasonal Worker at the Michigan Avenue store.

7.   In or around October 2021, Mr. Guzman began working at the Lincoln Park store in Chicago, Illinois, in a part-time Specialist role, and was promoted to Operations Specialist in April 2022, a position he held until his termination on April 11, 2024.

8.   Mr. Guzman performed his job duties in a satisfactory manner and had no material performance issues prior to engaging in the protected activities described herein. His positive performance history provides a baseline which shows that later discipline did not arise from longstanding performance deficiencies. In fact, in Spring 2022, Mr. Guzman

FILED DATE: 9/5/2025 3:48 PM    2025L011179

FILED DATE: 9/5/2025 3:48 PM    2025L011179

was ranked top three in Sales for one quarter while serving as a Specialist in the Product Zone. In 2023, he was also ranked among the top three Runners in his Operations Specialist role, an achievement that was celebrated at a store meeting in January 2024.

9. Mr. Guzman is Mexican American, Latino and Brown. He is also an outspoken advocate for Palestinian and Black coworkers and other minorities.

### **November 9, 2023, Advocacy on Behalf of Black & Palestinian Colleagues**

10. October 7, 2023, marked the beginning of the Israel's large-scale offensive against Gaza, resulting in mass civilian casualties and widespread destruction. On January 26, 2024, the International Court of Justice (ICJ), in *Application of the Convention on the Prevention and Punishment of the Crime of Genocide in the Gaza Strip (South Africa v. Israel)*, found that South Africa had presented a plausible claim that Israel's conduct could constitute genocide under the Genocide Convention. The Court ordered binding provisional measures requiring Israel to prevent acts of genocide against Palestinians in Gaza, ensure the provision of humanitarian assistance, and prevent and punish incitement to commit genocide. *See* Order of Jan. 26, 2024, I.C.J. Rep. 2024, ¶¶ 54–78, 86.

11. On or around October 9, 2023, CEO Tim Cook issued an internal statement to all Apple employees expressing support for Israel but omitting any mention of Palestine. In response, Mr. Guzman posted a message on WorkJam, Defendant's internal messaging system for employees, expressing solidarity with the Palestinian people and calling for recognition of Palestinian suffering.

12. On or around November 9, 2023, Mr. Guzman and ten other employees (the majority of whom are people of color) emailed store and corporate leadership a letter detailing discrimination against Palestinian and Black employees and listing five demands for reform.

3

FILED DATE: 9/5/2025 3:48 PM    2025L011179

13. The letter began by noting that Defendant leadership's discomfort with Palestinian identity and expression had seeped into the culture of individual stores, including Lincoln Park.  Mr. Guzman and his colleagues stressed that Palestinian employees felt silenced, dehumanized, and stereotyped, as if their identity were inherently threatening. They explained that Defendant's refusal to even acknowledge the word "Palestine" or permit open discussion of Palestinian suffering conflicted with its own public commitments to diversity, equity, and inclusion, and was creating a hostile work environment for Palestinian employees.

14. The letter also highlighted broader systemic discrimination at the Lincoln Park store, particularly against Black colleagues. The writers observed that Black employees made up approximately one-quarter of the workforce, yet 10 out of the last 14 terminations involved Black colleagues. They noted that discipline was disproportionately used against Black and brown staff, who were also the ones most frequently subjected to misconduct write-ups, Documented Coaching, and terminations. As they explained, "These experiences leave us hurt, angry, exhausted, sad, and discouraged from coming into work. This is our reality. This is the weight we carry."

15. The letter concluded with five demands: the creation of a Middle Eastern and North African employee resource group, protection of Palestinian employees in the workplace, a written apology for harassment and disparate treatment, mandatory unconscious bias training for all staff, and disciplinary accountability for racist conduct.

16. Management never responded to the letter or acknowledged the concerns raised within it.

17. This pattern was not new. At his prior assignment at the Michigan Avenue store, Senior Manager Austin Kihn was notorious for firing Black employees and even used a

4

FILED DATE: 9/5/2025 3:48 PM    2025L011179

racial slur in front of staff, according to former employee Joy Richard. After his transfer to the Lincoln Park store, he continued the same pattern of subjecting employees of color to harsher discipline while white employees were not held to the same standards. Mr. Guzman was one of the employees singled out under this pattern.

### Selective Ban on Palestinian Cultural Symbols

18. Near the end of October, Mr. Guzman and several colleagues began wearing "Free Palestine" wristbands in solidarity with both the people of Gaza and with coworkers who felt silenced and excluded in the workplace, particularly those of Arab and Palestinian background. Mr. Guzman also wore a keffiyeh (patterned scarf), a widely recognized symbol of Palestinian culture and heritage.

19. On or around November 25, 2023, Store Leader Jo Allen and Senior Manager Kathy Tobiaski pulled Mr. Guzman aside and ordered him to remove his "Free Palestine" bracelet, citing safety concerns. Mr. Guzman asked what would happen if he continued wearing the bracelet. Allen stated it would be treated as misconduct and would violate Defendant's "Respect at Apple" policy. Mr. Guzman then asked if he could wear the bracelet inverted; Allen and Tobiaski agreed.

20. On or around November 30, 2023, Manager Kevin Aguilera pulled Mr. Guzman aside and stated that leadership was now communicating a new "no bracelet" policy to the entire store. This ban then evolved to prohibit anything with a Palestinian flag; no inverted bracelet, necklace, pins, or jewelry would be allowed.

21. On or around December 1, 2023, management began enforcing the policy, instructing more than 40 workers to remove their Palestine bracelets.

22. The policy prohibited any expression of Palestinian identity, including symbolic items such as watermelon bracelets, even though Defendant has historically permitted other

FILED DATE: 9/5/2025 3:48 PM    2025L011179

forms of cultural and political expression—such as Black Lives Matter, Ukraine, and Pride pins, as well as comparable ethnic attire.

23. On or around December 2, 2023, and throughout the month of December, multiple employees raised concerns about the policy. One employee, Destiny Strothers specifically questioned the policy because it was unwritten and further noted the alienating effect it would have on Palestinian colleagues. Ms. Strothers was later pulled aside by Senior Manager Kihn who characterized her concerns as "disrespectful."

## December 5, 2023, Letter to Management

24. On December 5, 2023, Mr. Guzman submitted a written letter to Defendant's store and corporate leadership documenting systemic mistreatment of Palestinians and other employees of color at the Lincoln Park store. In the letter, Mr. Guzman recounted that management repeatedly ordered him and dozens of coworkers to remove "Free Palestine" bracelets and other Palestinian cultural symbols, even though Defendant historically permitted comparable cultural expression such as Ukrainian Flags and Black Lives Matter pins.

25. He further detailed that Palestinian identity and cultural attire, including the keffiyeh, were stigmatized as "political" and prohibited, while other ethnic identities were openly celebrated. The letter also reiterated concerns about a broader pattern of Black and brown employees facing disproportionate discipline.

26. Mr. Guzman closed the December 5, 2023, letter by requesting a written response by December 11, 2023, seeking clarification on the scope of the new "no bracelet" policy, how it would be enforced (including with respect to other ethnic groups), and whether management could lawfully impose and enforce unwritten, verbal-only policies. Management once again never provided any response or acknowledgment.

6

FILED DATE: 9/5/2025 3:48 PM    2025L011179

### December 2023: Safety Complaints, Escalating Retaliation and Excessive Monitoring

27. On or around December 16, 2023, Store Leader Allen, Manager Rob Ward, and Store Leader Jeremy Frenz convened a roundtable with Mr. Guzman and others.

28. Mr. Guzman informed management that the store was understaffed and that employees were being exploited. He also told his coworkers that they had the right to report such conditions to government agencies, specifically naming the National Labor Relations Board (NLRB), the Equal Employment Opportunity Commission (EEOC), the Occupational Safety and Health Administration (OSHA), and the Illinois Department of Human Rights (IDHR).

29. Mr. Guzman's own NLRB complaint alleged that Apple management became aware of his union organizing activities and responded with anti-union meetings, heightened monitoring, and retaliatory actions against employees.

30. On or around December 18, 2023, Mr. Guzman filed safety complaints to management and to OSHA regarding cluttered and unsafe mechanical areas, lack of ergonomics training, and lack of protective gloves.

31. OSHA issued a notice to Defendant and required partial remedial action.

32. Mr. Guzman's safety reports were protected whistleblower activity; the timing and escalation of scrutiny after these complaints further demonstrate retaliatory motive.

33. After these disclosures, management escalated discipline against Mr. Guzman by issuing him negative coaching entries, micromanaging his work, and stationing managers near him to monitor and intimidate him.

FILED DATE: 9/5/2025 3:48 PM    2025L011179

34. Within days of submitting his complaints, Sales Department Manager LaSondra Campbell questioned Mr. Guzman's run times[1] (over three minutes between 4:00–5:00 p.m.), even though five-to-seven-minute runs were common due to understaffing. Mr. Guzman had never previously been counseled about run times. Nevertheless, Campbell issued a negative "Grow on the Go" coaching entry, placing it in Mr. Guzman's personnel file for conduct that was routine among employees and ordinarily went unpunished.

35. This unusual negative feedback from a manager outside of his department given the same day he revealed he had reported the store to federal and state oversight bodies creates a strong inference that the feedback was retaliation.

36. About an hour later, Manager Ward pulled Mr. Guzman aside and told him to remain productive while running the product and avoid conversations; when Mr. Guzman asked if sitting was permitted, Manager Ward said yes, but not for extended periods.

37. Later that day, Manager Ward followed up that if Mr. Guzman wished to sit, he had to "partner with a manager," effectively requiring management presence for rest breaks; previously, Operations employees sat briefly between runs, especially when elevators were down.

38. Within a day or two, management began stationing a manager at the Operations desk at all times, an unprecedented practice, and began micromanaging run times.

39. Upon information and belief, the company's heightened surveillance and strict rule enforcement were pretextual measures intended to micromanage Mr. Guzman in order to build a case for his termination.

---

[1] At Apple, a "Runner" is an Operations Specialist assigned to retrieve products from the store's basement inventory and deliver them to the sales floor.  A run time is the time it takes the Runner to complete the task.

FILED DATE: 9/5/2025 3:48 PM   2025L011179

40. On December 18, 2023, although not scheduled for a quarterly "connection," Mr. Guzman was pulled aside by Managers Bria James (Product Zone) and Campbell (Product Zone/Genius Bar), neither of whom are his assigned connection leaders.

41. James raised attendance issues, to which Mr. Guzman responded that he would continue engaging in protected activity regarding workplace concerns, including understaffing and the treatment of Black and Palestinian colleagues. James stated that Mr. Guzman would receive the lowest rating, an "Expected More" for attendance. Manager LaSondra Campbell added that Mr. Guzman would also receive an "Expected More" for "innovation," citing a brief conversation Mr. Guzman had with a coworker on runner duty—a common occurrence unrelated to "innovation".

42.  Issuing downgraded ratings tied to Mr. Guzman's protected complaints constitutes retaliation.

43. On December 22, 2023, Manager Kenny Johnson Jr. told Mr. Guzman, who was speaking with coworker San Cherae, that employees were not supposed to have conversations unless also working; Johnson then walked to his office, outside of which two employees were conversing without working.

44. Mr. Guzman followed and asked if Johnson would address them; only then did Johnson tell the other employees to stop.

45. Later that day around 11:00 a.m., Senior Manager Kihn pulled Mr. Guzman aside for missing a download. A "download" is a mandatory meeting between a store leader or manager and the employees scheduled for a particular shift, typically held before the shift begins. Employees on the Operations team often miss downloads when handling tasks such as processing shipments or disposing of garbage. At the download in question, Mr. Guzman was absent because he was taking out garbage and preparing the store for opening.

46. Believing the repeated interruptions were retaliatory, Mr. Guzman called the Illinois Department of Human Rights and left a message stating he was constantly stopped by managers and felt treated as a second-class citizen; Manager Brian Clinzing overheard the call.

47. Shortly afterward, Mr. Guzman discussed contacting IDHR with San Cherae in the breakroom, and Johnson overheard.

48. These events demonstrate that management was aware of Mr. Guzman's civil-rights complaints and chose to monitor him and his protected communications.

**January 2024: Selective Attire Enforcement; Documented Coaching**

49. On January 15, 2024, the heating system at the Lincoln Park store was not functioning despite extreme winter temperatures. The store remained open, exposing employees to unsafe working conditions. Mr. Guzman reported the lack of heat on Defendant's internal WorkJam platform, which was received by store and corporate management. Rather than promptly remedying the issue or addressing Mr. Guzman's concern, Defendant continued to operate the store on one of the coldest days of the year. This incident further illustrates Mr. Guzman's protected activity in reporting workplace safety hazards, as well as Defendant's disregard for both his complaints and employee safety.

50. The keffiyeh is a widely recognized cultural symbol of Palestinian identity much like the Desi kurta, Japanese kimono, West African dashiki, and South Asian sari.

51. Keffiyeh are most commonly worn around the neck as a scarf; notably, scarves are not prohibited by Defendant's dress code.

52. On January 22, 2024, during an off-site, non-client-facing meeting across the street from the store, Mr. Guzman and coworker Madly Espinoza wore keffiyehs.

FILED DATE: 9/5/2025 3:48 PM  2025L011179

FILED DATE: 9/5/2025 3:48 PM   2025L011179

53. Before Mr. Guzman clocked in, Market Leader Sherice Louis-Jean instructed him to remove both his keffiyeh and jacket; Mr. Guzman complied, though multiple other employees wore jackets and winter scarves throughout the meeting without issue, including Ayesha (last name unknown) and Jordan Wallace.

54. During a breakout session in a cold hallway, Mr. Guzman and Ms. Espinoza wore jackets and keffiyehs. In the presence of Louis-Jean, they were again told to remove them. Other employees, however, continued to wear their jackets and scarves because of the cold, without being asked to remove them.

55. Employees frequently wore scarves during the winter, a practice routinely permitted without discipline, particularly because the store's heating system did not consistently function properly during colder months.

56. The selective enforcement targeting only Palestinian cultural expression illustrates disparate treatment compared to other employees wearing scarves.

57. In the early afternoon of January 22, 2024, Manager Ward and Manager James pulled Mr. Guzman aside; James took notes.

58. Ward stated Mr. Guzman had been two minutes late on December 2, 2023, and one minute late on January 15, 2024, and recommended eight weeks of Documented Coaching for attendance. Notably, January 15 was a bitterly cold day when the store's heating system was not functioning, and public transportation across Chicago experienced significant delays.

59. Documented Coaching is an internal performance management tool that functions as a formal warning. It also signals that the company is preparing for possible termination if the behavior does not improve within four weeks.

FILED DATE: 9/5/2025 3:48 PM    2025L011179

60. Mr. Guzman requested the documented-coaching policy in writing; Ward told him to "partner with Jo Allen" to obtain it.

61. When Mr. Guzman stated he believed the action was retaliatory, James stopped writing until Mr. Guzman requested that she include it; she again stopped when he said he would file a charge with IDHR until he asked that she note that as well.

62. Ultimately, Ward chose not to give Mr. Guzman the Documented Coaching on that date.

63. The threat of excessive penalty for such minor tardiness suggests management was using being one minute late as a pretext for penalizing Mr. Guzman for his protected activities, particularly since one of the cited infractions occurred more than a month earlier, indicating that attendance was not the true motivating factor.

64. On January 27, 2024, Ward again pulled Mr. Guzman aside with Manager Kenny Johnson taking notes to issue a four-week Documented Coaching for attendance.

65. Mr. Guzman pointed out there was no pattern of tardiness in the prior 90 days (on time or early 95% of the time in December and January and 100% in November).

66. Ward instead cited a failure to notify on September 17, 2023, and five tardies in October 2023.

67. Mr. Guzman reiterated that Ward and Manager Kevin had previously said attendance would be an issue resulting in an Expected More rating only if Mr. Guzman was late to 20% or more of shifts.

68. Ward refused when Mr. Guzman asked for a written copy of the conversation and only acknowledged that he could appeal after he pressed Ward on whether appeal was an option.

FILED DATE: 9/5/2025 3:48 PM    2025L011179

69. Issuing Documented Coaching without a contemporaneous pattern, and after Mr. Guzman's protected speech, supports a causal link to protected activity.

70. On January 28, 2024, Mr. Guzman appealed the Documented Coaching but received no response.

71. Mr. Guzman successfully completed the coaching period without incident.

### April 2024: Termination

72. On March 29, 2024, Mr. Guzman and approximately 500 other Apple employees sent a letter to Defendant's management and executive leadership expressing concern that Apple has treated workers who show solidarity with Palestinians unfairly. Employees reported being disciplined or accused of "breaking business conduct" and "creating a harmful environment" simply for wearing items like kaffiyehs, pins, bracelets, or clothing reflecting Palestinian identity. The letter further alleges that some employees have even been wrongfully terminated for such expressions of support. The signatories argue that this contradicts Apple's stated commitments to inclusivity, equity, and creating a welcoming workplace.

73. On April 11, 2024, Defendant terminated Mr. Guzman's employment, alleging he created an "unsafe and disruptive work environment."

74. The stated reason was pretextual; the termination followed months of selective enforcement, surveillance, and discipline tied to Mr. Guzman's Palestinian advocacy, civil-rights complaints, and safety reporting.

### COUNT I – ILLINOIS HUMAN RIGHTS ACT (775 ILCS 5/2-102)

#### Race, Color, National Origin; Associational

75. Mr. Guzman incorporates all previously-pled paragraphs as if fully set forth herein.

13

FILED DATE: 9/5/2025 3:48 PM    2025L011179

76. Mr. Guzman is a Latino, Brown, Mexican man who associated with and advocated on behalf of his Palestinian, Arab, and Black colleagues. Defendant discriminated and retaliated against Mr. Guzman in violation of the Illinois Human Rights Act, 775 ILCS 5/1-101 et seq., based on his race, color, national origin, and association with members of a protected group.

77. Defendant's discriminatory practices were carried out in part by Senior Manager Kihn, a white supervisor with a known history of firing Black employees and using racial slurs in the workplace. After his transfer to Lincoln Park, Austin continued to subject employees of color, including Mr. Guzman, to heightened discipline while white employees were not held to the same standard.

78. Defendant's selective ban on Palestinian cultural attire and symbols targeted Palestinian identity and penalized employees associated with Palestinians, resulting in both direct and associational discrimination.

79. Defendant targeted Mr. Guzman for increased scrutiny and pretextual punishment after Mr. Guzman raised concerns regarding the discriminatory conduct of management towards Palestinian and Black employees. The Illinois Human Rights Act, as interpreted by the Department's regulations, expressly protects individuals from discrimination based on their association with members of a national origin group. *See* Ill. Admin. Code tit. 56, § 5220.200(a) (protecting individuals discriminated against because of marriage to or association with persons of a national origin group) and § 5220.200(d) (protecting individuals discriminated against because of membership in, or association with, an organization identified with or seeking to promote the interests of a national origin group). These provisions confirm that Mr. Guzman was protected when he advocated on behalf of Palestinian coworkers and associated himself with their cultural expression.

14

FILED DATE: 9/5/2025 3:48 PM   2025L011179

80. Defendant's unlawful conduct caused Mr. Guzman to suffer significant economic loss, severe emotional distress and humiliation.

WHEREFORE, Mr. Guzman requests judgment against Defendant and an award in excess of $50,000, together with:

    A. Back pay, front pay, and lost benefits;

    B. Compensatory damages for emotional distress and reputational harm;

    C. Punitive damages;

    D. Costs;

    E. Attorney fees; and

    F. All other relief as the Court deems just and equitable.

<u>COUNT II – ILLINOIS HUMAN RIGHTS ACT (775 ILCS 5/6-101)</u>

Retaliation

81. Mr. Guzman incorporates all previously-pled paragraphs as if fully set forth herein.

82. The Illinois Human Rights Act makes it a civil rights violation "[f]or any employer to retaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination … or because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act." *See* 775 ILCS 5/6-101(A).

83. Mr. Guzman engaged in protected activity by opposing discriminatory practices in the workplace, advocating on behalf of Palestinian and Black coworkers, submitting a written complaint to Human Resources about discriminatory treatment, filing with the NLRB and OSHA, and indicating his intent to pursue relief before the IDHR.

FILED DATE: 9/5/2025 3:48 PM    2025L011179

84. Defendant, through its managers and supervisors, retaliated against Mr. Guzman by selectively enforcing workplace rules, issuing threats of disproportionate discipline, subjecting him to increased monitoring and scrutiny, and ultimately terminating his employment.

85. Defendant's retaliatory conduct violated §6-101 of the Illinois Human Rights Act. WHEREFORE, Mr. Guzman requests judgment against Defendant and an award in excess of $50,000, together with:

 A. Back pay, front pay, and lost benefits;

 B. Compensatory damages for emotional distress and reputational harm;

 C. Punitive damages;

 D. Costs;

 E. Attorney fees; and

 F. All other relief as the Court deems just and equitable.

<u>COUNT III – ILLINOIS WHISTLEBLOWER ACT (740 ILCS 174)</u>

86. Mr. Guzman incorporates all previously-pled paragraphs as if fully set forth herein.

87. Defendant Apple Inc. is an "employer," and Mr. Guzman was an "employee," within the meanings of 740 ILCS 174/5 at all relevant times.

88. In 2023–2024, Mr. Guzman disclosed and threatened to disclose to his supervisors and to government agencies (EEOC, IDHR, NLRB and OSHA) regarding Apple's unlawful and unsafe employment practices, including chronic understaffing and the intentional exploitation of workers.

89. Mr. Guzman's disclosures and threats to disclose were protected under Sections 10 and 15 of the Illinois Whistleblower Act.

FILED DATE: 9/5/2025 3:48 PM   2025L011179

90. Mr. Guzman reasonably believed the information disclosed related to activities, policies, or practices that violated state or federal law, rules, or regulations and/or posed a substantial and specific danger to employees, public health, or safety. 740 ILCS 174/15(a)–(c).

91. After and in close temporal proximity to Mr. Guzman's disclosures and threatened disclosures, Defendant took retaliatory action against Mr. Guzman, including heightened surveillance, selectively enforced rules, adverse evaluations/ratings, Documented Coaching, other discipline, and termination on April 11, 2024, actions a reasonable worker would find materially adverse.

92. Defendant's adverse actions were because of Mr. Guzman's disclosures, threatened disclosures, and/or reports of suspected violations under the Act. *See* 740 ILCS 174/15(a)–(c).

93. Defendant's conduct violates the Illinois Whistleblower Act, including Sections 15(a)-(c).

    a.  740 ILCS 174/15(a):  Employers may not retaliate against employees who, in good faith, disclose or threaten to disclose to a public body or in a legal/administrative proceeding, information about employer practices that violate the law or pose a substantial danger.

    b.  740 ILCS 174/15(b):  The same protection applies when disclosures are made to a government or law enforcement agency.

    c.  740 ILCS 174/15(c):  The same protection also applies when disclosures are made to a supervisor, officer, board member, or contracting organization.

94. As a direct and proximate result, Mr. Guzman suffered lost wages and benefits, reputational harm, emotional distress, and other damages.

FILED DATE: 9/5/2025 3:48 PM   2025L011179

WHEREFORE, Mr. Guzman requests judgment against Defendant and an award in excess of $50,000, together with:

A. Back pay, front pay, and lost benefits;

B. Compensatory damages for emotional distress and reputational harm;

C. Punitive damages;

D. Costs;

E. Attorney fees; and

F. All other relief as the Court deems just and equitable.

<u>DEMAND FOR JURY TRIAL</u>

Mr. Guzman demands a trial by jury on all issues so triable.

September 3, 2025

Respectfully Submitted,

By:    /s/Christina Abraham

Christina Abraham, Esq.
*Attorney for Plaintiff* Andres Guzman
17 N. State Street, Suite 1500
Chicago, IL 60602
(312) 212-1520
cabraham@cair.com

By:    /s/ Shana Nissan

Shana Nissan, Esq.
*Attorney for Plaintiff* Andres Guzman

18

FILED DATE: 9/5/2025 3:48 PM   2025L011179

17 N. State Street, Suite 1500
Chicago, IL 60602
(312) 374-2134
snissan@cair.com

## **CERTIFICATION**

Under penalties as provided by law pursuant to 735 ILCS §5/1-109 of Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Andres Guzman

9/4/25

Date